<pre>
 1                 UNITED STATES DISTRICT COURT

 2           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4                              )
      BEIJING ZHONGYI ZHONGBIAO  )  C13-01300-MJP
 5    ELECTRONIC INFORMATION     )
      TECHNOLOGY CO. LTD.,       )  SEATTLE, WASHINGTON
 6                               )
                    Plaintiff,   )  October 22, 2013
 7                               )
      v.                         )  Motion Hearing
 8                               )
      MICROSOFT CORPORATION,     )
 9                               )
                    Defendant.   )
10
      _____
11
                   VERBATIM REPORT OF PROCEEDINGS
12            BEFORE THE HONORABLE MARSHA J. PECHMAN
                   UNITED STATES DISTRICT JUDGE
13    _____

14

      APPEARANCES:
15

16    For the Plaintiff:      Randy J. McClanahan
                              MCCLANAHAN MYERS ESPEY, LLP
17                            3355 W Alabama Street, Suite 210
                              Houston, TX 77098
18
                              Chad E. Ihrig
19                            NIX, PATTERSON & ROACH, LLP
                              3600 N Capital of Texas Highway
20                            Building B Suite 350
                              Austin, TX 78746
21

22
      For the Defendant:      Ambika K. Doran & Stephen Rummage
23                            DAVIS WRIGHT TREMAINE
                              1201 Third Avenue Suite 2200
24                            Seattle, WA 98101-3045

25
</pre>

1    THE CLERK:  This is the matter of Beijing Zhongyi

2    ZhongBiao Electronic Information Technology Company v.

3    Microsoft Corporation, cause number C13-1300-MJP.  Counsel,

4    please make your appearance.

5        MR. McCLANAHAN:  For the plaintiff, Your Honor, Randy

6    McClanahan and Chad Ihrig.

7        THE COURT:  Good afternoon.

8        MR. McCLANAHAN:  Good afternoon.

9        MS. DORAN:  For the defendant, Ambika Doran.

10       MR. RUMMAGE:  Steve Rummage, Your Honor, for

11   Microsoft Corporation.

12       THE COURT:  Counsel, I've had an opportunity to read

13   your briefing that you filed in the Western District of

14   Arkansas.  I've also had an opportunity to read your

15   supplemental briefs that I asked for specifically asking for

16   the application of Ninth Circuit law.  And I hope that you

17   received the questions that I put out yesterday that I'd like

18   to have you respond to during the course of your argument.

19     So, if you're ready to begin, I believe that we allotted

20   20 minutes per side.

21       MR. McCLANAHAN:  Do you want the plaintiff to begin,

22   or Microsoft, since it's their motion we're here on?

23       THE COURT:  Well, it's Microsoft's motion, they have

24   the privilege of going first.

25       MS. DORAN:  Thank you.

1    Good afternoon.

2         THE COURT:  Good afternoon.

3         MS. DORAN:  I am going to briefly give you an

4    overview, and then during the course of the argument I'll

5    answer the questions that were posed in the court's e-mail

6    yesterday.  And I'm hoping to reserve seven minutes for

7    rebuttal.  And I hope Your Honor has a copy of the exhibits.

8         THE COURT:  I do.

9         MS. DORAN:  Okay.  Zhongyi brings this action against

10   Microsoft nearly 20 years after the parties signed the

11   applicable license agreement governing the use of certain

12   Chinese language fonts.  Microsoft's use of the fonts was no

13   secret, it's the world's largest software manufacturer, and

14   the fonts appeared in certain versions of its Windows

15   operating system.  Anyone can buy that software.

16       The parties agree that a 1995 font license agreement

17   governs this dispute.  The court should interpret the license

18   as a matter of law to dismiss Zhongyi's claims.  This

19   conclusion follows from two points.  First, the license

20   grants Microsoft to use the fonts in any products.  It

21   contains no language limiting the grant to Windows 95, as

22   Zhongyi contends.  Second, the court need not and should not

23   defer to the Chinese court's contrary interpretation of the

24   contract.

25       With respect to the first point, the license agreement, if

1    you'll look at page two of the exhibits, this is Section

2    11.1, the font license agreement.  And it states that this

3    agreement is governed by the laws of the State of Washington.

4    There is no dispute that as a general matter a choice of law

5    clause is enforceable.

6        Thus, the court has to look to Washington contract law to

7    interpret the contract.  Washington courts interpret the

8    words of a contract according to their ordinary meaning and

9    from an objective standpoint.  And if you look at the next

10   exhibit, page three, in *Hearst Communications v. Seattle*

11   *Times Company the Washington Supreme Court confirmed this*

12   *stating, "We attempt to determine the parties' intent by*

13   *focusing on the objective manifestations of the agreement."*

14       *THE COURT:  Counsel, can you slow down for me,*

15   *please.  I'm not going to get a good record on you.*

16       *MS. DORAN:  Okay.  In Hearst Communications v.*

17   *Seattle Times* the Supreme Court stated, "We attempt to

18   determine the parties' intent by focusing on the objective

19   manifestations of the agreement, rather than on the

20   unexpressed subjective intent of the parties.  We do not

21   interpret what was intended to be written but what was

22   written."

23       For example, in *Warner v. Design and Build Homes* the

24   Washington Court of Appeals interpreted a contract in which

25   the plaintiffs agreed to purchase property, "In its present

 1   as-is condition."  The court rejected the claim for breach of

 2   the warranty of habitability stating, "This court not only

 3   should not but it cannot rewrite the clear agreement of the

 4   parties."

 5       These principles require dismissal of Zhongyi's complaint

 6   because the license unambiguously permitted the allegedly

 7   infringing conduct.  The license grant, which is Section .2

 8   of the agreement, in it Zhongyi grants to Microsoft a

 9   perpetual, non-exclusive, worldwide, irrevocable license to

10   use, modify, translate and create derivative works based upon

11   the fonts; and reproduce, distribute or license (directly or

12   indirectly), or sell, rent or lease copies of the fonts

13   and/or derivative works thereof.

14       There is no condition in these grants that the fonts be

15   used in a particular product.  Were there any doubt,

16   Subsection 3 says that "Microsoft may do any other act in

17   order for it to engage in the full commercial exploitation of

18   any licensed product."

19       Section 1 of the agreement defines licensed product as

20   "Each Microsoft software product into which the fonts are

21   integrated."  This, again, contains no limit on what kind or

22   version of software product can incorporate the fonts.

23       The court asked in its e-mail yesterday whether there were

24   any limits on Microsoft's potential use of the fonts.  The

25   short answer is no.  There are no limits in the license

1   grant.  That being said, there is evidence suggesting that

2   the parties contemplated that Microsoft would continue to use

3   the fonts.

4       Section 3.3 of the font license agreement contains a cap

5   on the price after which the license grant shall, "Be royalty

6   free."  Thus there was some use, without payment,

7   contemplated by the parties.

8       In addition, the 1995 agreement was designed to make the

9   fonts comply with certain specifications promulgated by the

10  Chinese government.  The government amends those

11  specifications from time to time.  And, in fact, although

12  this is not on the record on this motion, it was on the

13  motion to transfer earlier in the case, the parties signed an

14  agreement in 2001 when the standard changed.  Thus, the

15  agreement was only contemplated for the period of time within

16  which the font specification was in force, and it would have

17  become obsolete within a certain period of time.

18      This is typical of Microsoft's practice with respect to

19  licensing fonts, which is in part designed to avoid the

20  hassles of having an audit provision.  And, in fact, there is

21  no audit provision in this license agreement, suggesting that

22  the license grant itself was unlimited.

23      Section 11.2 of the agreement --

24          THE COURT:  By "audit provision" you mean --

25          MS. DORAN:  I mean a provision allowing Zhongyi to

1   investigate Microsoft's use of the fonts and whether it

2   exceeded the scope of the license.

3          THE COURT:  So there would be a lot of beans to be

4   counted if you had to count every time Microsoft was going to

5   use this.

6          MS. DORAN:  Correct.

7          THE COURT:  While we're stopped, let me ask you one

8   other question.

9          MS. DORAN:  Sure.

10          THE COURT:  The fonts themselves, I understand, are

11   Chinese characters, the same way you would have alphabet

12   characters in English.  But what you're really licensing is

13   the computer program that creates those letters; am I

14   correct?

15          MS. DORAN:  It's a more complicated question, because

16   what will be at issue, if this case continues, is what is the

17   subject matter of Zhongyi's copyright?  And there is an open

18   question under U.S. copyright law, whether typeface and fonts

19   are protected under copyright law.  So to answer your

20   question, I believe what is being licensed is the typeface.

21   How it is transmitted to Microsoft would be in the form, I

22   believe, of software coding.  Although, I have a limited

23   understanding of software code myself.

24          THE COURT:  So in the United States you wouldn't be

25   able to have a proprietary interest in the font itself.  You

1   would be able to have an interest in the code that wrote the

2   font.

3           MS. DORAN:  I believe that is correct.

4           THE COURT:  Okay.  And apparently in China, you're

5   saying, that they were purchasing the appearance of the image

6   itself.

7           MS. DORAN:  I'd have to look at the agreement more

8   closely.  I'm not entirely sure, to be honest with you.  I do

9   think that the Chinese courts certainly found that the fonts

10  were protectable as a matter of Chinese copyright law.  And I

11  don't know and I don't necessarily think that would be the

12  answer under U.S. copyright law.

13      If you turn to the next page of the exhibits, page five,

14  this is Section 11.2 of the agreement.  And it states that,

15  "This agreement is the entire agreement regarding its subject

16  matter, and supersedes any prior agreements among the parties

17  relating thereto."  This means the court cannot and should

18  not consider the memorandum of understanding or the

19  supplemental memorandum of understanding.

20      The court asked in its e-mail yesterday also whether it

21  could convert this motion into one for summary judgment and

22  what else would need to be considered.  Microsoft's position

23  is that it's entirely unnecessary.  The court need only look

24  at the complaint and the agreement, which is incorporated by

25  reference into the complaint, to decide the motion.

1     But even if this were a summary judgment motion, Microsoft

2   would ask the court to consider the same evidence.

3         THE COURT:  Well, can't you extend that and say the

4   MOUs are part of the complaint itself?  In other words, are

5   they referenced in the complaint?

6         MS. DORAN:  I believe they are referenced, but I

7   would -- I'm sorry.

8         THE COURT:  So, what I'm really asking in my question

9   is don't I have everything necessary in order to convert this

10   to a summary judgment?  In other words, I've got the contract

11   and I've got the MOUs.  It's a simple question of what did I

12   consider?  Both sides have got the documents in front of me.

13   Why do you use the 12(b)(6) standard rather than the summary

14   judgment standard?  I mean, it's a harder burden of proof for

15   you.

16         MS. DORAN:  Right.  I understand that.  I would say

17   that we believe, yes, you have everything that you need in

18   front of you, the complaint and the agreement.  We don't

19   think there's any need to look at the MOU or the supplemental

20   MOU.  To the extent the court believes it ought to be looking

21   to extrinsic evidence, it's possible that if Zhongyi provided

22   some additional evidence we might want an opportunity to

23   rebut that evidence.

24         THE COURT:  But aren't I in a position right now to

25   say, okay, I've got all the documents under Washington law,

1   you know, I've got the MOU, but I don't look at the MOU.

2   Why wouldn't you want the summary judgment ruling rather than

3   the 12(b)(6) ruling, which is a harder standard for you to

4   meet?

5        MS. DORAN:  We would like either ruling.  You know,

6   you do have what we think you need to decide a motion for

7   summary judgment or a motion to dismiss.

8        THE COURT:  Well that's what I'm trying to find out,

9   if there's some secret reason I'm not thinking of as to why

10  you don't want the summary judgment and are arguing so hard

11  that I don't have all the documents in front of me.

12       MS. DORAN:  No, I'm not trying to say you don't have

13  the documents in front of you.  You absolutely do have them.

14       THE COURT:  Go ahead.  Thank you.

15       MS. DORAN:  With respect to the Chinese court

16  decisions, they have no bearing here.  It's well established

17  that U.S. courts are not obliged to recognize judgments

18  rendered by a foreign state.  The plaintiff has provided no

19  cases suggesting otherwise.

20     Most cases Zhongyi cites discuss the enforceability of

21  money judgments against U.S. defendants.  But Zhongyi does

22  not seek to enforce a Chinese judgment which addresses

23  Chinese copyright law.  Instead, it's trying to use a Chinese

24  judgment on a Chinese copyright law to resolve issues for a

25  claim under U.S. law.  Some of the cases discuss collateral

1   estoppel, but those cases do not require the court to be

2   bound by the Chinese decisions.  And in any event, the issues

3   here are not identical.  Again, the question here is whether

4   under U.S. copyright law Microsoft infringed the plaintiff's

5   copyright.  The decisions in China decide, as a matter of

6   Chinese law, whether Microsoft infringed the plaintiff's

7   copyright.  Copyright laws do not have extraterritorial

8   application.

9       Even if the court were to look to the Chinese decisions,

10  it should not defer to them.  The Chinese court failed to

11  apply Washington law and ignored the plain language of the

12  contract.

13      Page six of the exhibits is a portion of the Bejing High

14  Court's decision in which it says, "When both parties dispute

15  the scope of any Microsoft product, agreed in a font

16  agreement of 1995, the cognitive abilities and duties of care

17  of all parties to the agreement should be comprehensively

18  considered, and the judgment should be made in accordance

19  with the basic principles of copyright law."

20      Thus, the court considered the "cognitive abilities and

21  duties of care," merely because the parties disputed the

22  scope of the agreement, not because it found any ambiguity in

23  the license's terms.

24      Even if the court does look at the MOU or the supplemental

25  MOU, they do not change the proper result here.  Zhongyi was

1    not a party to either the MOU or the supplemental MOU, and so

2    they cannot have any bearing or be any evidence of the 1995

3    agreement.  Neither the MOU nor the supplemental MOU have any

4    limiting language whatsoever.  And, in fact, the supplemental

5    MOU in Appendix A supports Microsoft's interpretation.  In

6    essence, Zhongyi is asking the court to imply a limit in

7    these memoranda, to which Zhongyi was not even a party, and

8    then incorporate that limit into the fully-integrated 1995

9    font license agreement, to vary the terms of that agreement.

10        In any event, the Chinese Supreme Court is looking now at

11   Microsoft's application for a retrial and has asked for

12   briefing on what would happen under Washington law.  The

13   court should enforce the terms of the contract.  The Chinese

14   judgment has no bearing on what the contract means under

15   Washington law.  The court can and should dismiss the claims

16   as a matter of law.

17             THE COURT:  Thank you.

18             MR. McCLANAHAN:  Your Honor, under the local rules I

19   understand I need your permission to use a laptop.  I'm told

20   I had to, is that okay?

21             THE COURT:  Nobody has asked me for that before.

22             MR. McCLANAHAN:  I asked your courtroom deputy or

23   somebody in here earlier.  She said it would be okay.

24             THE COURT:  Well, then obviously you got a higher

25   ruling.

1          MR. McCLANAHAN:  No, I'm trying to abide by the rules

2    that I thought I carefully read, that's all, Your Honor.

3    Randy McClanahan for the plaintiff.  Thank you for your time

4    this afternoon, and good afternoon.

5          This is really a simple case.  I want to start off by

6    following something that she said in the very first slide

7    where she says, "This agreement is governed by the laws of

8    the State of Washington."  It goes on to say, "And the

9    parties hereby consent to the jurisdiction of the state and

10   federal courts in the State of Washington," which Microsoft

11   has referred to as a forum selection clause in their briefing

12   to the court.

13         Interestingly, and I do agree with her when she says that

14   Microsoft, as we all know, is a big company, maybe the

15   biggest in the world.  They know what they're doing.  And

16   they didn't appear and litigate in China by accident.

17   Microsoft could have asked the Chinese court to stay

18   everything and do the litigating in Washington where

19   everybody had agreed was a forum.  And they didn't do that.

20   Nor did Microsoft ever raise anything about Washington law in

21   the trial court in Beijing .

22         What they did was they made all the same arguments in

23   China that they have made before Your Honor, and they lost.

24   But can you imagine what would have happened if they had won?

25   They would not be here saying, oh, we can't give any full

1    faith and credit, or recognize, or whatever we want to

2    ultimately call it, the China judgment.  They would say,

3    you're bound by it, Zhongyi, you lost.

4        So Microsoft wants two bites at the apple where they had

5    carefully considered -- we all know they've got access to the

6    best lawyers in the world, everywhere in the world, and they

7    decided they wanted to litigate this in China.  And they

8    lost.  And now they're trying to find a way out of that.

9        It's a little bit like the *Robinson Helicopter* case that

10   we cited, where in another case in the Central District of

11   California a company was sued by a Chinese company, an

12   American company was sued.  And they said, no, forum non

13   conveniens, send it to China.  Which they did, the judge did

14   that.  The case went to China and was decided adversely to

15   the American defendant.  They came back and the American

16   defendant asked the court to enforce the judgment.  And the

17   court did enforce the judgment.

18       It's very much the same thing in this case.  It's

19   obviously not technically a forum non conveniens situation,

20   but Microsoft could have litigated in Washington and chose

21   not to.  They could have raised Washington law and chose not

22   to.

23              THE COURT:  Well, I asked you this in one of my

24   questions.  I'll ask it again.  So what?  In other words, you

25   tell me that that has significance, that they have waived

1   their right to raise the forum selection clause again --

2          MR. McCLANAHAN:  Well, the only significance -- I'm

3   sorry.

4          THE COURT:  But you don't cite me any case law to

5   that effect.

6          MR. McCLANAHAN:  That would be one of the three

7   questions that you had asked.  And I will answer it this way:

8   You had asked us, question three, you said:  You claim

9   Microsoft has waived the choice of law by not raising it in

10  China but providing the citation.  We address this at pages

11  21 to 26 of our response to defendant's motion to dismiss

12  filed November 1, 2012, Document No. 37.

13      And we said, in that brief we talked about Eighth Circuit

14  law.  We cited a case -- that's when the case was in Arkansas

15  -- we cited to a case called *Dayton v. Gilman* which said,

16  "Ignoring a provision in a contract will constitute waiver if

17  the party whom the provision favors continues to exercise his

18  contract."  And then --

19         THE COURT:  Hold on.  Show me where it is that you're

20  referring to.

21         MR. McCLANAHAN:  It's in Document No. 37, page 24.

22  "See *Dayton v. Gilman*."  And we quoted, "Ignoring a provision

23  in a contract will constitute waiver."  Et cetera, et cetera.

24      And then, to answer the court's question last night we

25  found --

1    THE COURT:  Well, wait a second, though.  The issue

2  is, is what does Chinese law say about, if you don't raise it

3  you've waived it?

4    MR. McCLANAHAN:  I don't have the answer to that.  I

5  would defer to the Chinese court.

6    THE COURT:  Isn't that one of the issues that's

7  really important, because they may have raised the forum

8  selection clause on their appeal?

9    MR. McCLANAHAN:  I have read the arguments that were

10  made in the Chinese courts.  And I have read the decisions of

11  the Chinese courts.  And the point that was made there is

12  that they never offered any distinction to show that China

13  law would be any different than Washington law.  And, in

14  fact, in their argument to the Supreme Court recently, the

15  judge indicated, well, it looks like it's the same thing to

16  me.  We obviously don't have an opinion yet.  But my point is

17  that Microsoft has not shown that there even would be any

18  difference between China and Washington law.  So we're

19  focusing on a point that I think probably is not the moving

20  point there.

21    THE COURT:  Okay.  Well, let me back up here.  You

22  cite to me Eighth Circuit law that basically says you either

23  raise it or you waive it.  That's U.S. Eighth Circuit law.

24    MR. McCLANAHAN:  That's true.  And I have a Ninth

25  Circuit case as well.

1         THE COURT:  How do you know that that rule -- I'm

2    assuming, was this an international case where somebody

3    didn't raise it?

4         MR. McCLANAHAN:  No, Your Honor, it's just a case of

5    American law.  I thought that that's what you were looking

6    for in the question that you raised.

7         THE COURT:  No, I was not looking for American law.

8    Well, perhaps I was looking for American law that says in a

9    forum outside the country you have to use it or waive it.

10   But is the rule inside the United States or does it apply

11   extraterritorially?  I don't know of any cases that say --

12   I've never run across this before -- that if you're

13   litigating internationally, that you have to raise

14   internationally every issue that you would raise inside the

15   local forum.

16        MR. McCLANAHAN:  Nor do I, Your Honor.  I don't know

17   it either.  And I would simply defer to whatever the Chinese

18   court ultimately ends up saying about that issue.

19        THE COURT:  Well that's what I was asking you for.

20   You seemed to be very certain in your footnote, or in your

21   briefing, that somehow they had waived it.  And I don't know

22   how you can say that unless you know what the rules are in

23   China.

24        MR. McCLANAHAN:  I don't know what the rule is on

25   that point in China, Your Honor.

1        THE COURT:  Okay.  Go ahead.

2        MR. McCLANAHAN:  So, the interesting thing -- now

3   that we've talked about Microsoft choosing to litigate in

4   China, and losing in China, we go to the question that I

5   think was talked a little bit about, and Your Honor mentioned

6   this MOU.

7        We've got to remember, I think, the overarching thing here

8   is that in order for intellectual property in China to be

9   exported out of China to somebody like Microsoft to get to

10  use on a worldwide basis, it has to be approved by the

11  Chinese government.  The Chinese government in the MOU set

12  forth the boundaries.

13       One of the interesting metaphors that was used in the

14  argument in the China Supreme Court talks about a bug in a

15  jar.  They say, if you have a bug in a jar, the jar defines

16  the boundaries that the bug can jump to.  The bug may want to

17  jump up, down, or sideways.  But it can't get out of the jar.

18  And the jar here, the MOU, the jar that the government of

19  China created was a license limited to Windows 95.

20       Now, in fact, even the license fees that were collected by

21  Zhongyi and paid by Microsoft were specified by the

22  government.  So to suggest -- when Microsoft suggests that

23  for some reason this '95 license agreement ought to be looked

24  at by itself and not in the context of the government MOU

25  which defines the jar, which defines the limits of what can

1    be exported, which defines the extent to which Microsoft is

2    allowed by the government of China to get this license, can't

3    be done.  It has to be done in context.

4         And obviously the decisions about the use of extrinsic

5    evidence go one way and the other.  They've got their cases.

6    We've got ours.  And the case that we have cited to the

7    court, the Supreme Court of Washington in the *Berg v.*

8    *Hudesman* case, basically says what the court always needs to

9    do is to determine the intent of the parties.  And when you

10   look at -- that's exactly, by the way, what the Chinese court

11   has done.  They've said, if you look at the whole context of

12   the transaction, beginning with the MOU and the supplemental

13   MOU, the intent of the parties was only to license Windows

14   95.

15        Now, a couple of your other questions that I wanted to be

16   sure that I answer before we run out of time, you've asked

17   about what evidence would be needed if you did convert this

18   12(b)(6) motion into a motion for summary judgment.  And I

19   think that that is the second question.  Because the evidence

20   that I can think of -- for example, if this were to be

21   converted into a motion for summary judgment, we would ask to

22   file a cross motion for recognition of the Chinese judgment.

23   And the evidence that I was thinking about just kind of while

24   I was listening off to myself, the sort of things I think

25   would be helpful to the court, yes, certainly all of the

1    written materials that you mentioned today like the MOU and

2    the supplemental MOU and that sort of thing.  But I think

3    also declarations of fact witnesses would be helpful to the

4    court.  I think that perhaps declarations of an expert would

5    be helpful to the court.  In the recognition of a foreign

6    judgment there are five factors that need to be considered by

7    the court.  And we would like to present those five factors

8    to the court.

9            THE COURT:  Well, let's talk a little bit about

10   whether you have a foreign judgment.  Because that was one of

11   my other questions.  You say on page two, Footnote 2 in your

12   briefing, that you've got a final and enforceable judgment,

13   but you don't give me any citation to that.  How do I know?

14           MR. McCLANAHAN:  That was your question number one of

15   yesterday, as I understand it.  In plaintiff's motion for

16   leave to amend responses to defendant's motion to transfer

17   and dismiss, which is document No. 46, filed on April 29,

18   2013, at page four, we state, "In the final and enforceable

19   judgment issued by the Higher People's Court regarding the

20   Chinese appeal and how it relates to this litigation, the

21   Higher People's Court replaces the previous judgment entered

22   by the intermediate court, which is the trial court, and that

23   has a provision in it, the judgment of the Appellate Court

24   has a provision at the end of it that says "The judgment is

25   the final judgment."

1    Now, there's also something we cite in that same document

2    from the civil procedure law of the People's Republic of

3    China in which we cite -- we quote from that where it states

4    "The judgments and rulings of the people's court of second

5    instance" which is the Appellate Court here, "shall be

6    final."  And that's Civil Procedure China Article 178, which

7    says "Any party that considers a legally effective judgment

8    or ruling to be faulty may apply to the intermediate superior

9    people's court for retrial.  Nevertheless, execution of the

10   judgment on ruling shall not be suspended in the meantime."

11   And then we cite some commentators and some books that are

12   commenting on that very law.

13   And also, Your Honor, we have pointed out to the court in

14   Document No. 72 that was filed on September 16, 2013, that

15   there is a notice regarding acceptance of execution and it

16   provides that the judgment "has entered into legal force."

17   So, the civil procedure law of China is that the decision

18   of the Appellate Court, which has now been rendered, is a

19   final judgment.  It is true that Microsoft has appealed to

20   the Supreme Court in Beijing.  As I understand the status of

21   the procedure, they haven't yet decided if they're going to

22   take the case.  It seems to me like it's something like a

23   writ of certiorari that would be over here.  I don't know,

24   I'm not representing China law to the court.  But we do have

25   a final judgment.  And I know that in America when you have a

1    final judgment of a trial court, for example, it stays a

2    final judgment until something above it happens to reverse

3    it.  So that's the authority that we have cited in our

4    earlier papers in this matter regarding that.

5        And back to your other question about the evidence.  I

6    think it may also be useful to the court to read the briefs

7    and the arguments that were made in the China court.

8    Microsoft says a lot of things on the record that I think

9    frankly are contrary to some of the things they're saying in

10   this court today.

11       But the point I want to make that supersedes all of that

12   is that this is not necessary to do if the court decides to

13   recognize the Chinese judgment.  For example, if the court

14   decides to recognize the Chinese judgment, all of that work

15   has already been done.  The court has already examined all of

16   these arguments that Microsoft has made.  The court has

17   considered the effect of the MOU.  The court has considered

18   the effect of the language used.  The court has considered

19   all of the arguments that Microsoft has made, and rejected

20   them.  And if you are going to recognize that judgment, we

21   would respectfully submit that that would perhaps be the best

22   first thing for the court to decide in this case.  Because if

23   you do decide to recognize the Chinese judgment, then we

24   don't need to go through all of those contorted efforts to

25   figure out, yet again, what was going on with those

1    agreements.

2        And, in fact, the case law that talks about recognition of

3    foreign judgments says that the reason we do this in the

4    appropriate circumstances is to prevent re-litigation of

5    issues that have already been litigated.

6        And to be very specific with the court, Your Honor, what

7    we're asking for here is very much like a collateral

8    estoppel.  We're saying that we're suing Microsoft for

9    copyright infringement under the U.S. Copyright Act.  So

10   elements of the proof are going to be, did we have a

11   copyright, for example, did they infringe the copyright, and

12   what are the damages going to be?

13       They're coming up with a defense.  They say, well, we've

14   got a license.  And we say, you're collaterally estopped.

15   You can call it issue preclusion.  Different courts talk

16   about it using different terms.  But that issue, the issue of

17   whether or not Microsoft has a license has been decided in a

18   case that Microsoft appeared in, fought hard for, and lost.

19   They are precluded now from relitigating that point.

20       So, we come into your court in a copyright --

21           THE COURT:  But where do you get the authority for

22   that?  In other words, operating internationally, does the

23   preclusion or the estoppel cross international boundaries?

24           MR. McCLANAHAN:  Yes.

25           THE COURT:  All right.  Well, what if I basically

1   say, all right, you've got a Chinese judgment, but the

2   Chinese court got it all wrong, because they should have been

3   applying Washington law.  And if they applied *Berg v.*

4   *Hudesman* and its progeny you don't get to the MOUs, because

5   there isn't anything ambiguous about the contract itself.

6           MR. McCLANAHAN:  Well, in that particular case, for

7   example, the one that you just mentioned, the *Berg v.*

8   *Hudesman* case, the court says there that it's not talking

9   about deciding if the writing is unambiguous and then not

10  going outside the four-corners of the document.  What the

11  court says in the context rule, it says that, "We now hold"

12  -- this is the Supreme Court of Washington en banc -- "We now

13  hold that extrinsic evidence is admissible as to the entire

14  circumstances under which the contract was made as an aid in

15  ascertaining the parties' intent."

16          THE COURT:  Counsel, what I'm going to tell you is

17  that *Berg v. Hudesman* has been around for probably my entire

18  legal career and it's not quite as easy as that quote.  There

19  is a huge body of litigation that came out of that case.  And

20  to go back to simply quoting from it really doesn't keep up

21  with where Washington law has gone.

22          MR. McCLANAHAN:  Which is why, Your Honor -- and

23  there are a number of cases out there talking about giving

24  effect to foreign judgments that say, it is not necessary or

25  even necessarily important that the foreign law be the same

1    as the American law.

2        For example, recognition of foreign judgments requires

3    that there be considerations of due process in the foreign

4    country.

5        The cases have said that by definition no country's laws

6    are going to be exactly like ours.  No country's concepts of

7    due process are going to be exactly like ours.  The way that

8    a country applies its own law, as long as it meets overall

9    fairness and concepts of justice, is enough.  And we've got

10   to respect that country's decision of applying its own law

11   even though it may be different from our own law.

12       My point is simply that to let Microsoft go into China and

13   litigate, on purpose, these issues in China, not even raise

14   Washington law, hoping to win and then preclude us from being

15   able to attack it later on, and then have them lose and come

16   in and say:  Oh, King's X, never mind, it doesn't matter, we

17   get a second bite at the apple.  That's not what the concept

18   of recognition of judgments is all about.

19       And the idea is to keep the court from having to retry an

20   issue that's already been tried.  Even though there are going

21   to be differences, always, between the law of the foreign

22   forum and the law of the United States, there's always going

23   to be differences.  But that's not the point that the cases

24   look at.  The cases look at the extent to which they have due

25   process and meet these other factors that we've talked about.

1    I think I've answered all the court's questions that you

2  had asked us.  I don't want to leave anything out.  Does it

3  sound to you like I've answered them all?

4         THE COURT:  Well, you've answered the ones that I

5  asked.  But you're talking about two bites of the apple.  If

6  we're talking about two bites of the apple, why are you here

7  asking for money when you didn't ask for it in China?

8         MR. McCLANAHAN:  Because China does not have the

9  authority to award damages for violation of U.S. copyright

10  law.

11         THE COURT:  Why aren't you happy in litigating in

12  that forum and deciding that's all you get?

13         MR. McCLANAHAN:  Because we want to sue them for

14  damages over here and we also want to get the injunction

15  enforced.  Microsoft is obviously not honoring what the

16  Chinese court has ordered it to do.  They're continuing to do

17  exactly what they've been doing.  And we're going to need to

18  have a court in the United States to order them to stop these

19  products that are infringing our copyrights.

20         THE COURT:  So everybody needs two bites of the

21  apple?

22         MR. McCLANAHAN:  No, Your Honor.  We're not asking

23  for a second bite of the apple, we're asking you to enforce

24  the judgment that was issued in China.  We litigated and won.

25         THE COURT:  But you're asking for more than that.

1   You're asking for money damages.  You're not asking just for

2   an injunction.  I mean, you could have come to Washington and

3   litigated all those issues.  And you didn't.  And so to say

4   that Microsoft is getting two bites of the apple, when you're

5   doing exactly the same thing, because you're asking for a

6   different package of relief, that argument doesn't go very

7   far.

8           MR. McCLANAHAN:  Well, I understand what you're

9   saying.  And with respect, the Chinese court does not have

10  authority to award damages for violation of the American

11  copyright laws.

12          THE COURT:  Right, just like the Chinese court

13  doesn't have authority to make Microsoft stop doing what

14  they're doing.

15      My next question to everybody is, okay, let's assume

16  Microsoft wins here.  Then what has Microsoft got?  Do they

17  keep producing their products using the Chinese characters,

18  and make them out in Redmond, and wait for them to be

19  bootlegged into China?  Because I assume the Chinese are

20  going to stop them at the border.

21          MR. McCLANAHAN:  Well, it's going to be an

22  interesting problem if the Chinese court rules one thing and

23  the American court rules another thing.  That's why we think

24  the American court should recognize the judgment in China,

25  which is the way, I think, the international system is set up

 1    to work.

 2            THE COURT:  Well, the international system honors

 3    certain types of judgments.  In particular, when you're

 4    talking about copyrights, it doesn't go very far outside the

 5    borders.

 6            MR. McCLANAHAN:  And, again, we're not talking about

 7    recognition of extraterritorial effects of copyrights.  We're

 8    talking about an issue, a factual issue, did Microsoft have a

 9    license to do what they've done?  That's the issue.  It's a

10    fact that has been adjudicated and found against them.

11            THE COURT:  So why did it take so long for you to

12    litigate in China when you're long past the initial Windows

13    releases that is what you say is all they were bargaining

14    for.

15            MR. McCLANAHAN:  Well, the China case was filed what,

16    Chad, back in 1996?  Over a decade ago.  A long time ago.

17            THE COURT:  From 2007 to 2013 is not a decade.

18            MR. McCLANAHAN:  I need to check the documents.  I

19    think it was filed before that.

20            THE COURT:  What I'm saying is from the time that

21    they signed the contract until the time that the suit was

22    initiated in China, Microsoft produced lots of products.

23    They're producing products every year.  I can pretty much

24    count on the fact that every November, right before

25    Christmas, somebody is going to sue.  It's a regular

1   business, because they want to release their next best thing.

2      So, you know, if you were really limited just to the

3   Windows 95, what took you so long to tumble to the fact that

4   this was not a perpetual license?

5          MR. McCLANAHAN:  I don't have the answer to that

6   question right now.  I can try to find it out for you, but I

7   don't know it right now and I'm not going to make something

8   up.

9          THE COURT:  Okay.  Thank you very much.

10         MR. McCLANAHAN:  Thank you, Your Honor.  Nice to meet

11   you.

12         THE COURT:  Nice to meet you, too.  All right.  Any

13   rebuttal, please.

14     Oh, just an aside how in the world did this case get to

15   Texarkana, Arkansas.

16         MR. McCLANAHAN:  Well, Your Honor, for one thing

17   Walmart can be sued there, as can Microsoft.  And there may

18   be some people that are nervous about suing Microsoft in

19   their own backyard if they can help it.

20         THE COURT:  That's pretty far from their backyard.

21         MR. McCLANAHAN:  I'm talking about Seattle.

22         THE COURT:  No.  No.  No.  I'm talking about going

23   to Texarkana, Arkansas is pretty far from Microsoft's

24   backyard.

25         MR. McCLANAHAN:  Walmart is located in Bentonville,

1    Arkansas.  And venue is proper.  It was transferred per

2    1404(a).

3          THE COURT:  Well, I don't doubt that the venue was

4    proper.  I was just curious, because I don't see many

5    transfers from Arkansas, to be perfectly honest.

6          MR. McCLANAHAN:  Well, we're happy to be in your

7    court, Your Honor.

8          THE COURT:  Okay.  Very good.

9       Okay, counselor.  Well, is the Chinese judgment final or

10   not?

11         MS. DORAN:  I don't think it matters whether it's

12   final or not.  The issue here is not whether the court should

13   enforce a Chinese judgment.  The Chinese court decided

14   whether Microsoft, as a matter of Chinese law, infringed the

15   copyrights of the plaintiff.  It's not about giving effect to

16   that judgment.  It is about using that judgment in this court

17   to preclude Microsoft from arguing that under the contract in

18   accordance with the Washington law choice of law provision

19   and under U.S. law Microsoft did not infringe Zhongyi's

20   copyright.

21      The full faith and credit clause does not apply in the

22   international context.  And as you pointed out, there are no

23   cases that they have cited that require the court to defer to

24   China.  It is definitely a matter of the court's discretion.

25   And it's something that when you look at it, you have to look

1   at what's fair and reasonable.  That's what the principles of

2   comity dictate.  It is patently unreasonable for the Chinese

3   court to have failed to enforce the Washington choice of law

4   provision and to have read into the contract terms that

5   simply aren't there.

6       With respect to what the contract says, and the Parole

7   Evidence Rule, *Berg v. Hudesman*, as you've said, has been

8   litigated extensively since that time.  And in *Hearst v.*

9   *Seattle Times* the court explicitly said, "Our holding in *Berg*

10  may have been misunderstood, as it implicates the admission

11  of parole and extrinsic evidence.  We take this opportunity

12  to acknowledge that Washington continues to follow the

13  objective manifestation theory of contracts."

14      And notably absent from Mr. McClanahan's argument was any

15  mention of what the license grant actually says, any mention

16  of the fact that it is, in fact, unlimited.  We believe

17  that's enough for the court to grant Microsoft's motion.

18      With respect to the issue of waiver.  The court is

19  correct, we have not located any cases suggesting that a

20  failure to raise an argument in a foreign court waives the

21  parties' ability to make that argument in the U.S. courts.

22  But moreover, this was not an issue that was waived or not

23  briefed in the Chinese court.  The Chinese Appellate Court,

24  and this is in the record, did decide whether to enforce the

25  Washington choice of law clause.  There was a lengthy

1    declaration submitted in the China litigation that cited

2    extensively to Washington case law.  The Appellate Court

3    decided the choice of law issue, and the parties are now

4    briefing the choice of law issue before the Chinese Supreme

5    Court.

6        So if the question is whether it was waived in China,

7    plainly it was not.  And even in the U.S., a challenge to a

8    choice of law can be made for the first time on appeal.  And

9    we cited a case in our brief which is *Radiation Sterilizers*

10   *v. U.S.*, which is an Eastern District of Washington case from

11   1994.

12       Waiver is an equitable doctrine in any event, and it does

13   not bind the court.  And given that the court in China

14   refused to enforce the parties' agreed choice of law

15   provision, equity requires that the court not find waiver

16   here.  Thank you.

17            THE COURT:  Thank you.

18       All right, counsel, I'll write for you on the topic.  And

19   you should see an order coming out in ten days.  So look for

20   it.

21       A couple of things:  If this case keeps on going I'm going

22   to ask, please, that when you write for me, no footnotes.  If

23   it's good enough to have me read, it's good enough to have it

24   in a font size that I can read.  So there is one judge who is

25   a friend of mine who basically said, "If God had wanted

1  judges to read footnotes he would have put our eyes in

2  vertically."  They don't work for me.  So put them in the

3  body of your brief.  And they're much easier for me to work

4  with while I'm thinking about your analysis.

5      So if you consider that just a Pechman's peccadillo.  So,

6  have good safe travels and look for the opinion.  Thank you.

7                  (The proceedings recessed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Debbie K. Zurn, RPR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


Dated this 25th day of October, 2013.


/s/ *Debbie Zurn*

DEBBIE ZURN
OFFICIAL COURT REPORTER