1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

BEIJING ZHONGYI ZHONGBIAO
ELECTRONIC INFORMATION
TECHNOLOGY CO. LTD.,

               Plaintiff,

    v.

MICROSOFT CORPORATION,

               Defendant.

CASE NO. C13-1300-MJP

ORDER GRANTING MOTION TO
DISMISS

     This matter comes before the Court on Defendant Microsoft's motion to dismiss the complaint for failure to state a claim. (Dkt. No. 27). In this copyright infringement case, Defendant Microsoft moves for dismissal on the theory that the alleged infringing conduct — its use of certain fonts in Chinese versions of Windows operating systems — is permitted by the parties' licensing agreement. Having reviewed the motion, Microsoft's memorandum in support (Dkt. No. 28), Plaintiff's response (Dkt. No. 37), Microsoft's reply (Dkt. No. 42), the parties' supplemental submissions (Dkt. Nos. 72, 73, 77, 78), all related papers, and having heard oral argument on October 22, 2013, the Court GRANTS the motion.

**Background**

Plaintiff, Beijing Zhongyi ZhongBiao Electronic Information Technology ("Zhongyi"), is a Chinese company who claims it developed and owns the copyrights to certain Chinese character fonts (hereafter "The Fonts"). (Dkt. No. 1 at 2.) In 1995, Zhongyi granted Microsoft a license to use The Fonts. It now claims Microsoft exceeded that license by using the Fonts in some Windows operating systems. (Id.)

    a.  Pre-license Agreements

In 1994, Microsoft and the People's Republic of China signed a Memorandum of Understanding for the development of a Chinese version of Microsoft Windows 95 operating system. (Dkt. No. 29 at 6.) As part of that MOU, the parties agreed Microsoft would utilize fonts meeting Chinese government standards. The Chinese government, in turn, agreed to assist in the procurement of The Fonts. In a supplemental MOU, the parties agreed to certain technical standards for the fonts. (Id. at 9.) Neither MOU discussed Microsoft eventually licensing these fonts. (Id.) Zhongyi was not a party to either of the MOUs. (Id. at 6-9.)

    b.  1995 License Agreement

In 1995, Zhongyi, Microsoft, and the Chinese government entered into a licensing agreement to allow Microsoft to use The Fonts in Microsoft products (the "1995 Agreement"). The recitals to the 1995 Agreement explained:

> Whereas Vendor [Zhongyi] has developed certain fonts which MS desires to license from Vendor to be used for Microsoft Windows 95 PRC version or any other Microsoft Product.

(Dkt. No. 29 at 19.) The 1995 Agreement granted to Microsoft "a perpetual, non-exclusive, worldwide, irrevocable license to: (i) use, modify, translate, and create derivative works based upon the Fonts in object and source code form…" (Id. at 19-20.) Further, the 1995 Agreement allowed Microsoft to: "to do any other act in respect of the Fonts which is necessary in order for

ORDER GRANTING MOTION TO DISMISS- 2

1 MS to engage in the full commercial exploitation of any Licensed Product." (Id. at 20.)

2 "Licensed Product" was defined as "each Microsoft software product or Microsoft or OEM

3 imaging device or peripheral into which the Fonts are integrated." (Id. at 19.) The agreement

4 contained a royalty payment scheme, which commenced upon the release of the Chinese version

5 of Windows 95 and was capped at $1,000,000. (Id. at 20.)

6       The 1995 Agreement also contained an integration clause making it "the entire agreement

7 among Microsoft, CITS, and Vendor [Zhongyi] regarding its subject matter and supersedes any

8 prior agreement among the parties relating thereto." (Id. at 23.) The Agreement also contained a

9 choice of law and forum selection clause making the agreement subject to the "laws of the State

10 of Washington and the parties hereby consent to the jurisdiction of the state and federal courts

11 sitting in the State of Washington." (Id.)

12       c.  Chinese Litigation

13       This is the second case regarding Microsoft's use of The Fonts. In 2007, Zhongyi sued

14 Microsoft in the People's Republic of China, Beijing 1st Intermediate People's Court, a trial

15 court, making the same allegations it does here. (Dkt. No. 1 at 6.) Zhongyi sought an injunction,

16 but no money damages. The court, applying Chinese copyright law, found in favor of Zhongyi,

17 concluding, "The license [1995 Agreement] was limited to Windows 95 Chinese Version." (Dkt.

18 No. 30). Critical to that determination was the court's consideration of the MOUs: "as this case

19 is special, because the licensed subject concerned in the contract needs to be approved by the

20 state, it is necessary to take related contents of the Government Agreement into consideration."

21 (Dkt. No. 30 at 12.) Using the MOUs as a lens, the Court found the license could not have

22 exceeded the scope of the pre-license discussions regarding Windows 95. (Id.) The court then

23 issued an injunction and ordered Microsoft to stop using The Fonts in non-Windows 95

24

1  operating systems.  (Dkt. No. 1 at 2.)  Microsoft appealed the trial court's findings.  An

2  intermediate appellate court affirmed.  (Dkt. No. 72.)  Microsoft has appealed that decision,

3  which is still pending.  (Dkt. No. 73.)

4          d.  Procedural posture

5          In the instant case, Zhongyi sued Microsoft and Wal-Mart in the Western District of

6  Arkansas.  Against Microsoft, Zhongyi alleged copyright infringement for using and publishing

7  The Fonts in non-Windows 95 operating systems.  (Dkt. No. 1 at 9.)  The case was transferred to

8  this Court in July 2013.  (Dkt. No. 53 at 9.)  Zhongyi dismissed Wal-Mart from the case in

9  September 2013.  (Dkt. No. 69.)

10         In the pending motion, Microsoft moves to dismiss the complaint under Civil Rule

11  12(b)(6) on the theory that the 1995 Agreement granted it a irrevocable license to use The Fonts

12  in any Microsoft product, thereby eviscerating any claim for copyright infringement.  (Dkt. No.

13  28.)  Zhongyi argues Chinese courts have already interpreted the scope of the license, finding it

14  extended only to Windows 95 and not to later operating systems.  (Dkt. 37 at 9.)  It argues that

15  finding bars re-litigation of the issue here.

**Analysis**

16

17      A.  Legal Standard

18         A motion to dismiss under Rule 12(b)(6) may be based on either the lack of a cognizable

19  legal theory or the absence of sufficient facts alleged under a cognizable legal theory.  Balistreri

20  v. Pacifica Police Department, 901 F.2d 696, 699 (9th Cir. 1990).  Material allegations are taken

21  as admitted and the complaint is construed in the plaintiff's favor.  Keniston v. Roberts, 717 F.2d

22  1295 (9th Cir. 1983).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does

23  not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

24  entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

1  elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555

2  (2007) (internal citations omitted).

3      "Factual allegations must be enough to raise a right to relief above the speculative level,

4  on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id.

5  The question for the Court is whether the facts in the complaint sufficiently state a "plausible"

6  ground for relief. Id. at 570. A claim is plausible on its face "when the plaintiff pleads factual

7  content that allows the court to draw the reasonable inference that the defendant is liable for the

8  misconduct alleged." Aschcroft v. Iqbal, 556 U.S. 662, 678 (2009).

9      B.  Copyright Infringement

10     A copyright infringement claim has two elements: (1) ownership of a valid copyright;

11  and (2) copying of constituent elements of the work that are original. Feist Publications, Inc. v.

12  Rural Telephone Service Co., 499 U.S. 340, 361 (1991).  Where, like here a copyright disputes

13  involves only the scope of the alleged infringer's license, the question presented to the  court is

14  one of contract: "whether the parties' license agreement encompasses the defendant's activities."

15  Bourne v. Walt Disney, 68 F.3d 621, 631 (2d Cir. 1995).  The ultimate burden of persuasion on

16  these two elements rests with the Plaintiff. Feist Publications, 499 U.S. at 361.

17      1.   Under Civil Rule 12 Microsoft can challenge the scope of the license

18     First the Court must decide if Microsoft can raise its affirmative defense (a license to use

19  The Fonts) in the context of a Rule 12(b)(6) motion. Zhongyi argues the motion is a premature

20  attempt at summary judgment because Rule 12 only tests the legal sufficiency of the complaint

21  and not the merits of defendant's affirmative defenses.  This argument misstates the law in this

22  circuit.  Instead, "affirmative defenses routinely serve as a basis for granting Rule 12(b)(6)

23  motions where the defense is "apparent from the face of the [c]omplaint." Goddard v. Google,

24  Inc., 640 F.Supp.2d 1193, 1200 (N.D.Cal. July 30, 2009).  It is well established that the existence

1  of a license creates an affirmative defense to a claim of copyright infringement." <u>Worldwide</u>

2  <u>Church of God v. Phila. Church of God, Inc.</u>, 227 F.3d 1110, 1114 (9th Cir. 2000).  Here, there

3  is no question that Microsoft's affirmative defense is apparent from the face of the complaint:

4  > Microsoft elected to license the fonts….the license granted Microsoft was only
   > used for the project of Windows 95 Chinese language software to be released in
5  > [the] People's Republic of China.

6  (Dkt. No. 1 at 5.)  The complaint further explains how in the Chinese litigation, Microsoft argued

7  "that the license agreements were not limited to Windows 95, but also licensed subsequent

8  operating systems and all other Microsoft products."  (<u>Id.</u> at 6.)  By the complaint's own

9  recitation, Plaintiff's claim succeeds or fails on the scope of the license agreement.

10       Further, where as is the case here, the complaint incorporates documents (1995

11  Agreement and MOUs), the Court may consider them in ruling on a 12(b)(6) motion.  <u>See</u> <u>e.g</u>.

12  <u>Intri–Plex Technologies, Inc. v. Crest Group, Inc.</u>, 499 F.3d 1048, 1052 (9th Cir. 2007).  The

13  Ninth Circuit has extended the doctrine of incorporation by reference to consider documents in

14  situations where the complaint necessarily relies upon a document or the contents of the

15  document are alleged in a complaint, the document's authenticity is not in question and there are

16  no disputed issues as to the document's relevance. <u>See</u> <u>Knievel v. ESPN</u>, 393 F.3d 1068, 1076

17  (9th Cir. 2005).

18       2.  Chinese court's decision is not binding

19       Zhongyi hangs much of its opposition to dismissal on the Chinese litigation's supposed

20  preclusive effect: "If the Chinese judgment is binding on Defendants…then Defendants' key

21  defense under the 1995 Agreement should be rejected and the primary remaining issue in this

22  law suit will be the amount of damages for violation of the Federal Copyright Act."  (<u>Id.</u> at 17-

23  18.)  This argument is flawed for at least two reasons.

24

ORDER GRANTING MOTION TO DISMISS- 6

1       First, Zhongyi badly mischaracterizes the finality of the Chinese litigation.  (Dkt. No. 37

2   at 17.)  The case is on appeal and Chinese courts could yet rule in Microsoft's favor.  (Dkt. Nos.

3   42 at 16, 73).  It is a fundamental tenet of collateral estoppel that a decision must be final for

4   there to be any preclusive effect.  See e.g. Southcenter Joint Venture v. Nat'l Democratic Policy

5   Comm., 113 Wn.2d 413, 418 (1989)( Under Washington law, the party asserting the doctrine

6   bears the burden of proving the following: (1) the issue decided in the prior adjudication is

7   identical with the one presented in the current action; (2) the prior adjudication concluded in a

8   final judgment on the merits; (3) the party against whom the plea is asserted was a party or in

9   privity with a party to the prior adjudication; and (4) the application of the doctrine will not work

10  an injustice on the party against whom the doctrine applies).  Without a final judgment,

11  preclusion doctrines do not apply.

12      Second, even apart from the lack of finality, this Court is not required to accept, at face

13  value, the factual and legal conclusions of a foreign court.  See Wright, Miller & Cooper, Federal

14  Practice and Procedure: § 4473.  Zhongyi relies on Barzilay v. Barzilay, 600 F.3d 912, 920 (8th

15  Cir. 2010), for the notion that the Chinese court's findings as to the scope of the 1995 Agreement

16  determine the answers to the legal questions presented here.  (Dkt. No. 37 at 10.)  But Barzilay

17  addressed the accord United States courts must give to foreign judgments under the Hague

18  Convention: "federal courts adjudicating Hague Convention petitions must accord full faith and

19  credit only to the judgments of those state or federal courts that actually adjudicated a Hague

20  Convention claim in accordance with the dictates of the Convention."  Barzilay, 600 F.3d at 920.

21  Comity for the adjudication of international convention-related claims, which the United States

22  is a signatory, is a far cry from the situation presented here: a non-final decision by a Chinese

23  court applying Chinese law.  Nor are the other cases cited by Zhongyi controlling, because they

24

1    largely address the enforceability of foreign money judgments.  See e.g. Hubei Gezhouba

2    Sanlian Industrial Co., Ltd. v. Robinson Helicopter Co., Inc., 2009 WL 2190187 (C.D.Cal. July

3    22, 2009) (California's Uniform Foreign Money-Judgments Recognition Act applied to a foreign

4    judgment).

5          In sum, the Chinese litigation is not final, has no preclusive effect, and the Court finds no

6    basis to recognize a foreign court's factual findings in this U.S. copyright action.

7          3.  License allows Microsoft to use The Fonts in any product

8              a.  Choice of Law provision mandates Washington law applies

9          Before turning to the merits, this Court must decide what law applies in interpreting the

10   license.  As Microsoft correctly argues, the 1995 Agreement contains a choice of law provision

11   stipulating to the "laws of the State of Washington and the parties hereby consent to the

12   jurisdiction of the state and federal courts sitting in the State of Washington."  (Id.)  By the

13   parties own agreement, Washington law applies.

14         Zhongyi concedes that the license stipulates to Washington law, but argues Microsoft

15   either waived the choice of law provision or is judicially estopped from arguing it.  (Dkt. No. 37

16   at 30.)  On both points, Zhongyi is wrong.  Beginning with the first, Zhongyi asserts that

17   Microsoft failed to argue Washington law before the Chinese Court and thus has waived the

18   provision.  Standard waiver doctrine defines waiver as "'an intentional relinquishment or

19   abandonment of a known right or privilege.'"  Barker v. Wingo, 407 U.S. 514, 525 (1972).

20   Here, Zhongyi has not shown that Microsoft has intentionally waived the choice of law

21   provision, when Microsoft raised the issue in its appeal still pending in China.

22         On the second point—whether judicial estoppel bars the application of Washington

23   law—Zhongyi position is based on a fundamental mischaracterization of that doctrine.  The rule

24

1   of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an

2   argument and then relying on a contradictory argument to prevail in another case." <u>Pegram v.</u>

3   <u>Herdrich</u>, 530 U.S. 211, 227, n. 8 (2000).  When a party assumes a position in a legal proceeding

4   and is successful, he cannot thereafter assume a contradictory position simply because his

5   interests have changed.  <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001).  In deciding

6   whether judicial estoppel should apply, a court should consider (1) whether a party's later

7   position is clearly inconsistent with an earlier position, (2) whether the party has been successful

8   in persuading a court to adopt its earlier position, so that acceptance of an inconstant position

9   would create a presumption that either the first or second court was mislead, and (3) whether the

10  party seeking to assert an inconsistent position would derive an unfair advantage or impose an

11  unfair detriment on the opposing party if not estopped. <u>Id.</u> at 750. "Absent success in a prior

12  proceeding, a party's later inconsistent position introduces no risk of inconsistent court

13  determinations." <u>Id.</u> at 750–51 (internal citations omitted).

14       With that template of law in mind, the Court cannot conclude judicial estoppel applies to

15  this case.  Microsoft did not succeed in the Chinese litigation.  Nor does Microsoft appear to

16  have taken an inconsistent opinion in each proceeding.  In the Chinese litigation, Microsoft

17  appears to have taken no position as to the application of Washington law during the trial

18  proceedings but has now raised the issue on appeal.  In the instant case, Microsoft also seeks to

19  enforce the choice of law provision.  As such, there is no inconsistent position estopping

20  Microsoft.  The Court applies Washington law.

21            b.   Plain language of License defeats the copyright infringement claim

22       Under Washington law, a court determines the meaning of an agreement using contract

23  interpretation rules, which focus on carrying out "the intent of the parties as manifested, if

24  possible, by the parties' own contract language." <u>Dep't of Corr. v. Fluor Daniel, Inc.</u>, 160 Wn.2d

1   786, 795 (2007).  Washington follows the objective theory of contracts, under which the court

2   attempts to determine the parties' intent by examining the objective manifestations of the

3   agreement, rather than focusing on the parties' subjective intents.  Hearst Commc'ns, Inc. v.

4   Seattle Times, Co., 154 Wn.2d 493, 501 (2005). The words of a contract are to be given "their

5   ordinary, usual, and popular meaning, unless the entirety of the agreement clearly demonstrates a

6   contrary intent." Id. at 503.

7           The 1995 Agreement permits Microsoft to use The Fonts in any of its products.  The

8   1995 Agreement granted Microsoft "a perpetual, non-exclusive, worldwide, irrevocable, license

9   to":

10          (i) use, modify, translate, and create derivative works based upon the Fonts in
            object and source code form;
11          (ii) reproduce, distribute or license (directly or indirectly), or sell, rent or lease
            copies of the Fonts and/or derivative works thereof in object and source code
12          form;
            (iii) to do any other act in respect of the Fonts which is necessary in order for
13          [Microsoft] to engage in the full commercial exploitation of any Licensed
            Product; and
14          (iv) sublicense to third parties the rights described in (i), (ii) and (iii) above.

15
    (Dkt. No. 29 at 19-20.)  Like the license grant itself, the definition of "licensed product" is also
16
    broad, defining "Licensed Product" as "each Microsoft software product … into which the Fonts
17
    are integrated." (Id. at 19.)  Nothing in the 1995 Agreement limits Microsoft's use of the Fonts.
18
    Microsoft, therefore, can incorporate the Fonts into any operating system or product, without
19
    limitation.  Because Microsoft has a license to use The Fonts, Zhongyi's infringement claim has
20
    no legal or factual basis.  It fails as a matter of law.
21
            Zhongyi urges the Court to consider the MOUs, as extrinsic evidence of the parties'
22
    intentions as to the scope of the license.  (Dkt. No. 37 at 25.)  The 1995 Agreement, however,
23
    contains an integration clause that bars the consideration of the MOUs here:
24

1
2
       This Agreement is the entire agreement by and among Microsoft, CITS, and Vendor regarding its subject matter and supersedes any prior agreement among the parties relating thereto.

3 (Dkt. No. 27 at 23.) Even apart from the integration clause, the MOUs cannot aid in

4 understanding the scope of the license for the simple fact that Zhongyi was not a party to the

5 MOUs. The 1995 Agreement stands alone as the agreement of the parties and evidence of their

6 intentions. The Court finds the plain terms of the 1995 Agreement dictate the scope of the

7 license. Denny's Restaurants, Inc. v. Sec. Union Title Ins. Co., 71 Wn. App. 194, 202

8 (1993)(integration clause bars consideration of extrinsic evidence).

9        Without any limitation on the scope of its license to use The Fonts, Microsoft, could

10 lawfully include them in any of its products. Zhongyi's claims fail as a matter of law.

11 **Conclusion**

12        Because Microsoft has a irrevocable license to use The Fonts in any of its products,

13 Zhongyi's claims for copyright infringement fail as a matter of law. The Court GRANTS

14 Microsoft's motion to dismiss with prejudice.

15        The clerk is ordered to provide copies of this order to all counsel.

16        Dated this 31st day of October, 2013.

17

18

19                  Marsha J. Pechman
                   Chief United States District Judge

20

21

22

23

24

ORDER GRANTING MOTION TO DISMISS- 11